FILED

09/04/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 13, 2024 Session

## STATE OF TENNESSEE v. VINCENT TREDEAU MCCORD

**Appeal from the Criminal Court for Davidson County**
**No. 2021-D-1802    Cynthia Chappell, Judge**

_____

**No. M2023-01209-CCA-R3-CD**

_____

The defendant, Vincent Tredeau McCord, was convicted of three counts of rape of a child, three counts of aggravated sexual battery, and one count of sexual exploitation of a minor by electronic means, and he was sentenced to an effective term of sixty years in the Tennessee Department of Correction. On appeal, the defendant argues that the evidence is insufficient to sustain his convictions and that the trial court erred in allowing testimony that the victim's mother suffered a medical event that caused the loss of a pregnancy. Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and KYLE A. HIXSON, JJ., joined.

Will Allensworth, Assistant Public Defender, Nashville, Tennessee (on appeal); Annie Berry and Casey Elliott, Assistant Public Defenders, Nashville, Tennessee (at trial), for the appellant, Vincent Tredeau McCord.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Addie Askew and Addison Rogers, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Facts and Procedural History*

The defendant was indicted for three counts of rape of a child, three counts of aggravated sexual battery, and one count of sexual exploitation of a minor by electronic means, arising out of allegations concerning his eleven-year-old daughter, L.C.,[1] that took place over a four-month period in late 2020, early 2021.

The victim's mother, T.C., and the defendant began dating in 2007 and were in a relationship when the victim was born in October 2009. T.C. and the defendant separated before the victim's first birthday, and aside from occasional visits and phone calls, the defendant was largely absent from their lives over the course of the following years. However, in October 2020, the defendant moved in with T.C., the victim, and T.C.'s toddler daughter from another relationship. The victim turned eleven shortly after the defendant moved in.

During the time the defendant lived with the family, T.C. worked two jobs, a full-time job during the week and a second job on the weekends. T.C.'s mother watched the children while T.C. was at her daytime job, and T.C. often took the children with her to her second job. A few times the defendant offered to watch the girls instead of T.C. taking them with her to work, and she let him. Other than that, the only time the defendant was alone with the victim was when T.C. was asleep.

Asked if there had ever been an incident where the defendant and the victim were alone that made her feel uncomfortable, T.C. recounted a time when she noticed that the victim's bedroom door was shut and opened it to see the defendant lying behind the victim in the bed. T.C. asked what the defendant was doing in the victim's bed, and the defendant said they were "just doing something off the iPad." T.C. told the defendant that he did not need to be in bed with the victim. The defendant apologized and said, "[Y]ou know I would never do that to my child."

In January 2021, T.C. and the defendant got into an argument that resulted in the defendant leaving the home for two or three days. While the defendant was gone, T.C. learned that she was pregnant. When T.C. called and told the defendant about the pregnancy, "[h]e was happy" and wanted to return to the home. T.C. picked up the defendant to bring him home, and while driving, noticed she was being followed by another car. The car followed her onto the interstate and struck her car in an apparent attempt to run her off the road, causing extensive front-end damage, but T.C. continued to drive. When T.C. stopped at a red light, the man who was driving the other car exited his vehicle and approached the passenger side of T.C.'s car where the defendant was sitting. T.C. recognized the man as Cody Xavier. Mr. Xavier screamed at the defendant and busted

_____

[1] In order to protect minor victims of sexual abuse, this Court refers to victims and their family members by initials. No disrespect is intended by this practice.

T.C.'s car window. The defendant sat quietly and did not respond. T.C. drove to her sister's house where she confronted the defendant about what had happened, but the defendant denied knowing a reason for Mr. Xavier's behavior. Despite this incident, the defendant resumed living with T.C. and the girls.

On February 6, 2021, T.C. and the defendant were talking in the kitchen when the victim yelled for T.C. from upstairs, saying "it's an emergency." T.C. found the victim in the upstairs bathroom, and the victim told her, "[M]omma, I'm bleeding." The victim wiped herself and showed T.C. that there was blood on the tissue from her vagina. Thinking the victim might have begun menstruating, T.C. retrieved a sanitary pad, but before handing the victim the pad, T.C. inquired, "[H]as anybody been doing anything to you[?]" The victim's "mouth dropped like total shock." The victim said, "[M]omma, I don't want to get in trouble," and T.C. assured her she would not get in trouble and inquired again whether anyone had been "touching" her. The victim said, "[Y]es," and when asked by whom said, "[M]y daddy." T.C. was irate and confirmed that the victim meant the defendant. The victim also told T.C. that the defendant had "tried to do it last night," but she pretended to be asleep.

T.C. hugged the victim and told her that "everything was going to be okay." Then, T.C. told the victim to stay in her bedroom while T.C. called the police. T.C. also tried to call her mother and her sister to have someone come and pick up her youngest daughter. While T.C. was on the phone with 911, the defendant came upstairs and asked whom she was talking to on the phone. T.C. told the defendant that she was talking to her sister. On the 911 call, T.C. told the operator that the victim just revealed to her that the defendant had been touching her and that the victim wiped herself and showed T.C. that she was bleeding. T.C. told the operator that the victim said the defendant "tried to do it" the night before, but she pretended to be asleep. T.C. further told the operator that the victim said the defendant had started touching her after T.C. had started a second job, a couple months ago.

Emergency personnel responded to the scene, including police and medical technicians. Shelby Lollar, an EMT with the Metro Nashville Fire Department, responded to the victim's home, recalling it "was a very difficult scene" that she remembered "very vividly." The victim, T.C., and the defendant were all present. The victim was crying and "very upset." Ms. Lollar took the victim and T.C. to the ambulance to "get [the victim] out of that situation" and help the victim and T.C. to "calm down."

The victim told Ms. Lollar that the defendant began sexually assaulting her before Christmas. With Ms. Lollar present, T.C. asked the victim where the defendant was assaulting her, and the victim responded, "[W]here the doodoo comes out." The victim told Ms. Lollar that the night before the call, the defendant "rubbed her buttocks," but she

- 3 -

pretended to be asleep, so he did not do anything that night. However, the victim told Ms. Lollar that "several weeks prior, he did sexually assault her." Ms. Lollar recalled that T.C. explained some of the situation, but the victim also spoke for herself as well. Emergency personnel then transported the victim and her mother to Vanderbilt Children's Hospital.

Metro Nashville Police Department Officer Mitchell Tolzmann, who was a detective in the youth services division at the time of the offense, responded to Vanderbilt Children's Hospital where he met up with Harold Simpson from the Department of Children's Services ("DCS"). The two men spoke with T.C., who was "visibly upset," and then interviewed the victim outside of T.C.'s presence. The interview lasted about ten minutes, during which the victim seemed "cautious" or "reserved." The victim told the men that the defendant "had gotten in bed with her, and touched her inappropriately and touched her on her butt." Officer Tolzmann recalled that the victim never reported that the defendant had forced her to have vaginal sex, anal sex, or forcibly put his penis in her mouth.

The victim's records from Vanderbilt Children's Hospital reflect that the victim told a social worker that the sexual abuse began about two days after her birthday in October. The victim said that she usually sleeps on the couch and that the defendant would sleep on the floor and wait until her mother was asleep to initiate contact, or he would initiate contact when her mother was at work. The victim said that the defendant had put his penis in her mouth and "stuck his thing inside [her]." When asked whether it was her "front or back," the victim said both. The victim said that the defendant also rubbed her butt and showed her videos of girls and boys on an app, telling her that this is what he wanted them to do together. The victim reported that the defendant "tried" to initiate sexual contact the previous night, but she pretended to be asleep. The victim said the last sexual contact occurred a week earlier. The victim stated that she had experienced bleeding out of her private parts during some of these incidents and that the present day was not the first time she had bleeding. The hospital staff determined that the bleeding on the present day was the result of menstruation and not injury.

On the night of February 6, 2021, while T.C. was at the hospital with the victim, the defendant sent T.C. a series of text messages in which he denied the allegations, complained of being homeless, and threatened to damage her car.

On February 11, 2021, the victim had a forensic interview at the Nashville Children's Alliance, a child advocacy center. In the interview, the victim stated that the first incident of sexual abuse occurred after she had visited her mother at work and came home around 10:00 or 11:00 p.m. The victim was laying on the couch, and the defendant was on the floor where he slept. The defendant told the victim to come lay down with him on the floor, and when she did, the defendant started "touching on [her] butt and stuff" with

his "private." The defendant was on his knees, and he told the victim to bend over while she was on the floor. The defendant put his "private" inside her buttocks and asked if she liked it. The victim shook her head no. She said the defendant put his penis in both her "back" and "front." The victim said that when the defendant touched her buttocks with his penis, it felt "weird" and caused blood to come out. That same day, the defendant showed the victim a video on his phone where "the girl was touching on the boy."

The victim said the defendant did the "same thing" again the day after the first encounter and another time in the kitchen. She recalled that the defendant penetrated her on five different occasions. The victim said that blood came out of her after an encounter with the defendant on more than one occasion, and when she bled, the defendant told her to throw away her panties outside. She threw away her panties three times. Asked if anything ever came out of the defendant's "private," the victim said, "like water or something" came out of the defendant's penis at every encounter and "[h]e just squirted it on the wall."

The victim described an incident when the defendant asked if she wanted to play a motorcycle game on the tablet, and he turned off the light and closed the door. As she played the game, the defendant touched her "butt crack" with his finger. She tried to scoot away to get him to stop, but the defendant did not stop. Finally, the victim's mother came into the room, and the defendant moved his hand. Her mother asked why the door was shut.

The victim recalled that the defendant told her to touch his penis. The first time she said no, and he grabbed her hand and touched his penis with her hand. The defendant also told her to lick his penis, and when she did not, "he just grabbed my head and just st[u]ck it up in my mouth." The defendant also licked the victim's breasts.

The day after the forensic interview, on February 12, the victim was interviewed and examined at the Our Kids Center. The victim told the interviewer that the defendant touched her private area, her chest, and her buttocks. She said the defendant touched her "private" with "his private." In her words, the victim said the defendant used "his private" to touch "on my skin, on my private, and on my butt and in my butt hole[.]" She confirmed that when the defendant touched her private area, it was on "the inside of her private." The victim said it happened five times. The victim stated that "stuff came out" of the defendant's private area, and he put it on a towel.

The victim also reported that the defendant penetrated her anus with his finger and his private part. The victim said that the defendant "licked [her] boobs" and made her touch his private part. The victim stated that the first time the defendant penetrated her private area, her "private started to bleed" and that the defendant told her to throw away

her panties. The victim recalled that the last time sexual contact happened was when the defendant asked her to play a game on her tablet, and "he touched her butt crack with . . . his finger." The contact ended when the victim's mother entered the room and asked what was going on.

A pediatric nurse at the Our Kids Center performed a physical examination of the victim, and the examination revealed no signs of injury. However, according to the nurse, it was "[a]bsolutely" possible and "the expected finding" for there to be no physical injuries in a sexual abuse case. The nurse explained that the genital and anal areas of the body stretch and heal quickly, and that 95% of sexual abuse victims do not show signs of injury.

The victim was also tested for sexually transmitted diseases, including Trichomoniasis, at the Our Kids Center. The victim's mother had previously tested positive for Trichomoniasis, which she suspected of having contracted from the defendant. The victim's mother had gotten tested for sexually transmitted diseases after she learned that the defendant had been sexually involved with Mr. Xavier, who was rumored to be infected with Trichomoniasis. The victim did not test positive for Trichomoniasis or any other sexually transmitted disease. However, the nurse examiner explained that it is possible for a person to be exposed to a sexually transmitted disease and not contract the disease.

The victim testified at trial that the video the defendant showed her was "of a girl and a boy touching," both were completely naked and she could see their private parts. The victim said that she had never seen a video like that before. The victim stated that she had seen blood in her underwear after the defendant had "done something to her" on three occasions and had to throw her underwear away. With regard to the day the defendant was in the bed with her playing a game on the tablet, the victim recalled that the defendant "had his hand touching . . . [her] butt and stuff."

The State made an election of offenses at the close of its proof. Count 1 referred to the defendant's anal penetration of the victim with his penis when the victim said that "he put his private part in her butt, back or butt hole." Count 2 referred to the defendant's vaginal penetration of the victim with his penis when the victim said in her forensic interview that "his private part went into my back, my butt hole and my front." Count 3 referred to the defendant's insertion of his penis into the victim's mouth when the victim stated in her forensic interview that "he told me to do it, and I said no and then he just got my head and just sticks his private in my mouth." Count 4 referred to the defendant's touching of the victim's breasts with his hands and mouth when the victim stated that "he touched my boobs before, and he was licking them and I tried to like move his forehead so he wouldn't do it, but he just – he just got his hand and moved my hand." Count 5 referred to the defendant's touching the victim's buttocks when the victim stated in her forensic

interview that "he turned off the light, and then I was playing a motorcycle game with him, and he started touching on my butt and then I just tried to scoot up so he wouldn't try to keep touching it." Count 6 referred to the defendant's touching his penis with the victim's hand when the victim stated in her forensic interview that "he told me to touch his private, and I said no – the first time I said no, and then he just grabbed my hand and then he touched his private with my hand." In Count 7, the State alleged that "[t]he [d]efendant directly, by means of internet service, displayed to a minor any material containing sexual activity."

The jury convicted the defendant as charged on all seven counts, and the trial court imposed an effective sentence of sixty years. The defendant appealed.

*Analysis*

## I. Sufficiency

The defendant challenges the sufficiency of the evidence, arguing that the "State's proof was based entirely on L.C.'s uncorroborated allegations." He additionally asserts with regard to the sexual exploitation of a minor by electronic means, that L.C.'s description of the video "was vague and did not sufficiently establish that the video depicted 'simulated sexual activity or sexual activity'" within the meaning of the statute. The State responds that, viewed in the light most favorable to the State, the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their

demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The defendant challenges L.C.'s credibility and argues that the "State's proof was based entirely on L.C.'s uncorroborated allegations," specifically pointing out that: (1) L.C. denied being sexually penetrated by her father when she spoke to Detective Tolzmann and Mr. Simpson at Vanderbilt Children's Hospital; (2) L.C.'s examination at the Our Kids Center revealed that L.C. had no physical injuries; (3) L.C. tested negative for Trichomoniasis, a sexually transmitted disease the defendant was alleged to have; and (4) the State's proof contained no physical evidence corroborating L.C.'s allegations. However, the victim's testimony alone is sufficient to support the defendant's convictions. *State v. Bonds,* 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." (internal quotation omitted)); *see also State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (holding that child rape victim's testimony was sufficient to support conviction,

despite some inconsistencies in the victim's testimony). Moreover, questions regarding the victim's credibility and the weight and value to be given her testimony are to be determined by the trier of fact and not this Court. *State v. Bland*, 958 S.W.2d 659, 659 (Tenn. 1997). Through its finding of guilt, the jury accredited the testimony of the victim, and we will not disturb that finding on appeal. *Id.*

Furthermore, there was in fact some evidence presented that corroborated the victim's account of the defendant's closing the door to her room and touching her buttocks by way of the victim's mother's testimony concerning the time she discovered the defendant and the victim in the bedroom with the door closed. The State also presented testimony from emergency personnel who responded to the victim's home concerning the acts the victim reported and the victim's emotional state the evening she exposed the abuse.

Finally, with regard to the lack of physical evidence and negative Trichomoniasis test, we note that the nurse who examined the victim testified that a lack of injury was the "expected finding" in most cases and not inconsistent with a report of abuse. Likewise, the lack of a positive Trichomoniasis test carries little wait because there was no actual proof submitted that the defendant was infected, and the State's expert witness reported that exposure to a sexually transmitted disease does not always result in infection.

Based on the victim's testimony, accredited by the jury, the evidence is sufficient to support the defendant's convictions for three counts of rape of a child and three counts of aggravated sexual battery. The defendant is not entitled to relief on this claim.

Next, the defendant argues regarding the sexual exploitation of a minor by electronic means conviction, that L.C.'s description of the video "was vague and did not sufficiently establish that the video depicted 'simulated sexual activity or sexual activity'" within the meaning of the statute.

Tennessee Code Annotated section 39-13-529(b)(2) provides:

(b) It is unlawful for any person eighteen (18) years of age or older, directly or by means of electronic communication, electronic mail or internet service, including webcam communications, to intentionally:

. . . .

(2) Display to a minor, or expose a minor to, any material containing simulated sexual activity that is patently offensive or sexual activity if the purpose of the display can reasonably be construed as being for

the sexual arousal or gratification of the minor or the person displaying the material[.]

The statute defines what constitutes "sexual activity," including "[l]ascivious exhibition of the female breast, genitals, buttocks, anus or pubic or rectal area of any person." Tenn. Code Ann. § 39-13-529(d)(4)(G). [2]

In *State v. Whited*, 506 S.W.3d 416 (Tenn. 2016), the Tennessee Supreme Court considered what constitutes "lascivious exhibition" within the meaning of the child pornography statutes, which contain the same lascivious exhibition language as the statute at hand. "Lascivious" has been defined by our supreme court as "tending to [incite] lust; lewd; indecent; obscene." *State v. Hall*, 682 S.W.3d 143, 152 (Tenn. 2019) (citing *Whited*, 506 S.W.3d at 430). The court noted that whether a depiction rises to the level of "lascivious exhibition" is a mixed question of law and fact, and "an intensely fact-bound question." *Id.* at 427, 431. "[M]ere nudity, without more, is insufficient to establish a lascivious exhibition of private body areas." *Id.* at 431.

The facts at issue in *Whited* involved the defendant's surreptitious recording of his stepdaughter and her friend in the bathroom while they went about normal daily activities like getting in and out of the shower, grooming, and changing their clothes. *Id.* at 442. The court held that, although it was a close question, the videos did not rise to the level of lascivious exhibition primarily because the minor victims were "engag[ed] in everyday activities that [were] appropriate for the settings and [were] not sexual or lascivious within the ordinary meaning of those terms." *Id.* at 447.

Whereas, in the present case, the evidence was that the defendant showed the victim a video "of girls and boys . . ., telling her that this is what he wants them to do together." The defendant showed the victim the video the same day that he raped her for the first time. The victim testified that the male and female in the video were fully nude with their "private parts" exposed, and "the girl was touching on the boy." It is apparent that the subjects of this video were not going about routine daily activities as in *Whited*, but were, instead, engaged in activities of a sexual nature. Based on the victim's description of the video and context in which it was displayed, we conclude the video involved a lascivious exhibition of private body areas. *See State v. Holbrooks*, No. M2019-02099-CCA-R3-CD, 2020 WL 6060440, at *7 (Tenn. Crim. App. 2020) (determining that a photograph of a vagina was "sexual and lascivious within the ordinary meaning of those terms" where the "picture was sent during a text message thread about sex and sexual activity), *perm. app. denied* (Tenn.

---

[2] Subsection (G) was amended in 2023 to the following: "Exhibition of the female breast, genitals, buttocks, anus, or pubic or rectal area of any person that can be reasonably construed as being for the purpose of the sexual arousal or gratification of the defendant or another."

- 10 -

Feb. 4, 2021). Thus, the evidence is sufficient to sustain the defendant's conviction for sexual exploitation of a minor by electronic means.

## II. Witness Testimony

The defendant argues that the trial court erred in allowing testimony that the victim's mother suffered a medical event that caused the loss of a pregnancy. The State responds that the defendant waived this issue and is not entitled to plain error relief. We disagree with the State's assertion regarding waiver but determine the defendant is not entitled to relief under plenary review.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017).

Before trial, the defendant filed a motion to exclude evidence that the victim's mother, T.C., "was suffering a miscarriage during or before the allegations involved in this case." The trial court conducted a hearing, after which it instructed the State not to refer to T.C.'s miscarriage or ectopic pregnancy in its opening statement but otherwise took the issue under advisement.

On direct examination, the State elicited testimony that T.C. learned she was pregnant in January 2021 and her pregnancy precipitated the defendant's moving back into her home following a few days' absence. After T.C.'s cross-examination, the State requested a bench conference during which it argued to the court that the defense had "brought out a lot" on cross-examination, and "[t]heir theory is clearly to impeach and . . . to attack this mom's credibility." The State sought permission to elicit testimony that T.C. had a miscarriage so the jury did not "think she aborted the baby as another revenge tactic."

The court indicated that it had not anticipated that information about the pregnancy was going to be brought up at all, but acknowledged that its ruling could have been clearer and the defense "did not object when that came in." Defense counsel indicated that it did not object for "strategic reasons," but asserted that "at no point have we made any allegations that she intentionally ended the pregnancy." Acknowledging that the jury "could have a question about where this child is," the court determined that asking T.C.

- 11 -

whether she had an ectopic pregnancy would be allowed. The court stated, "I'm not a doctor, but I don't think an [ec]topic pregnancy is the same thing as losing a baby." The court elaborated that the ectopic pregnancy "explains where we are . . . [a]nd I think that's really different than a miscarriage, a very different thing than abortion." The defense was concerned that testimony that T.C. "lost the baby" would elicit sympathy but agreed to the State specifically asking T.C. whether she had an ectopic pregnancy.

During redirect, the State asked T.C. if the result of her pregnancy in January 2021 was an ectopic pregnancy, but T.C. did not understand the question. Defense counsel agreed for the State to ask whether there was a medical event that caused the loss of the pregnancy. Defense counsel specifically noted it did not want the term "baby" used. Thereafter, the State questioned T.C. as follows:

Q: Was there a medical event that caused the loss of your pregnancy?
A: Like I just knew I had a –
Q: The pregnancy didn't come to term?
A: No.

The State asserts that only plain error review is appropriate because the defendant waived the issue by expressly agreeing to the specific testimony. While the defense did eventually agree to the specific testimony, it is clear from the record that it did so because "the bell [had been] rung" and was making concessions to mitigate the damage. Defense counsel specifically commented that she "was under a similar impression [to the trial court] that the baby was never going to come up at all during the direct examination. It came up as a surprise." Given the "surprise" testimony, defense counsel agreed to the limited line of questioning to effectuate the trial court's goal of "balancing all the interest[s] here." Taking all of this into account, we do not agree with the State's assertion of waiver.

However, we determine under plenary review that the trial court did not err in allowing testimony that T.C. suffered a medical event that caused the loss of a pregnancy. After testimony came out that T.C. was pregnant by the defendant in the timeframe of the victim's disclosure, the question of what happened to that baby could have been left unresolved in the minds of the jurors. In order to balance the interests of the State in making it clear that T.C. did not "abort[] the baby as another revenge tactic" and of the defendant in not eliciting sympathy for T.C., the court allowed limited questioning concerning an ectopic pregnancy or "medical event." We determine that this testimony was relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in allowing the aforementioned testimony and, therefore, the defendant is not entitled to relief.

*Conclusion*

- 12 -

Based on the forgoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE